# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **LARRY G. RAMIREZ,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **v.** | § | **CIVIL ACTION NO.** |
| | § | |
| **MICHAEL J. ASTRUE,** | § | **SA-07-CV-0183 XR (NN)** |
| **Commissioner of the Social** | § | |
| **Security Administration,** | § | |
| | § | |
| **Defendant.** | § | |

## MEMORANDUM AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

**TO:   Honorable Xavier Rodriguez**
    **United States District Judge**

### I. Introduction

Plaintiff Larry G. Ramirez brought this action for judicial review of the final decision of

the Commissioner of the Social Security Administration (the Commissioner), determining that

Ramirez was not disabled for the purposes of the Social Security Act (the Act) and denying

Ramirez's application for Disability Income Benefits (DIB).  Ramirez asks the district court to

reverse the decision and to render judgment in his favor.  After considering Ramirez's brief in

support of his complaint,[1] the brief in support of the Commissioner's decision,[2] Ramirez's reply

brief,[3]  the record of the Social Security Administration (SSA) proceedings, the pleadings on file,

the applicable case authority and relevant statutory and regulatory provisions, and the entire

---

[1]Docket entry # 20.

[2]Docket entry # 25.

[3]Docket entry # 26.

record in this matter, I recommend affirming the Commissioner's decision.

I have jurisdiction to enter this memorandum and recommendation under 28 U.S.C. § 636(b) and this district's general order, dated July 17, 1981, referring for disposition by recommendation all cases where a plaintiff seeks review of the Commissioner's denial of the plaintiff's application for benefits.[4]

## II. Jurisdiction

The district court has jurisdiction to review the Commissioner's final decision as provided by 42 U.S.C. §§ 405(g), 1383(c)(3).

## III. Administrative Proceedings

Based on the record in this case, Ramirez exhausted his administrative remedies prior to filing this action in federal court.  Ramirez applied for DIB on June 18, 2002,[5] alleging disability beginning June 14, 2000.[6]  The alleged onset date is the day Ramirez contends that he injured his shoulder while working as a machine operator.[7]  Ramirez had that job for one day.  The Commissioner denied Ramirez's application initially and on reconsideration.[8]  Ramirez then asked for a decision by an ALJ.[9]  The ALJ issued a decision on May 28, 2004, concluding that Ramirez was not disabled within the meaning of the Act prior to March 1, 2001 and was not

---

[4]*See* Local Rules for the Western District of Texas, appx. C, p. 10.

[5]*See* SSA record, p. 13.

[6]*See* SSA record, p. 53.

[7]SSA record, p. 59.

[8]*Id*. at p. 13.

[9]*Id*. at p. 7.

disabled after December 10, 2002.[10]  Ramirez asked for review of the decision on June 25,

2004.[11]  The SSA Appeals Council denied the request for review on January 12, 2007.[12]  The

ALJ's decision became the final decision of the Commissioner for the purpose of district-court

review pursuant to 42 U.S.C. § 405(g).  Ramirez then filed his first lawsuit, seeking review by

the district court.[13]

### IV.  Issue Presented

> Is the ALJ's decision that Ramirez was not under a "disability," as
> defined by the Act, at any time between Ramirez's alleged onset
> date and March 1, 2001, and after December 10, 2002, supported
> by substantial evidence and does the decision comport with
> relevant legal standards?

### V.  Analysis

**A. Standard of Review**

In reviewing the Commissioner's decision denying disability benefits, the reviewing court

is limited to determining whether substantial evidence supports the decision and whether the

Commissioner applied the proper legal standards in evaluating the evidence.[14]  "Substantial

evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a

---

[10]*Id*. at pp. 13-22.

[11]*Id*. at p. 7.

[12]*Id*. at p. 3.

[13]Docket entry # 1.

[14]*Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995); 42 U.S.C. §§ 405(g), 1383(c)(3).

3

reasonable mind might accept as adequate to support a conclusion."[15]  Substantial evidence

"must do more than create a suspicion of the existence of the fact to be established, but 'no

substantial evidence' will be found only where there is a 'conspicuous absence of credible

choices' or 'no contrary medical evidence.'"[16]

      If the Commissioner's findings are supported by substantial evidence, then they are

conclusive and must be affirmed.[17]  In reviewing the Commissioner's findings, a court must

carefully examine the entire record, but refrain from reweighing the evidence or substituting its

judgment for that of the Commissioner.[18]  Conflicts in the evidence and credibility assessments

are for the Commissioner and not for the courts to resolve.[19]  Four elements of proof are weighed

by the courts in determining if substantial evidence supports the Commissioner's determination:

(1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians,

(3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age,

education and work experience.[20]

      **1. Entitlement to Benefits**

---

[15]*Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990) (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).

[16]*Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988) (quoting *Hames*, 707 F.2d at 164).

[17]*Martinez*, 64 F.3d at 173.

[18]*Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *see also Villa*, 895 F.2d at 1021 (The court is not to reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner.).

[19]*Martinez*, 64 F.3d at 174.

[20]*Id.*

4

Every individual who meets certain income and resource requirements, has filed an application for benefits, and is under a disability, is eligible to receive DIB benefits.[21]  The term "disabled" or "disability" means the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[22]  A claimant shall be determined to be disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[23]

### 2. Evaluation Process and Burden of Proof

Regulations set forth by the Commissioner prescribe that disability claims are to be evaluated according to a five-step process.[24]  A finding that a claimant is disabled or not disabled at any point in the process is conclusive and terminates the Commissioner's analysis.[25]

The first step involves determining whether the claimant is currently engaged in

---

[21]42 U.S.C. § 1382(a)(1) & (2).

[22]42 U.S.C. § 1382c(a)(3)(A).

[23]42 U.S.C. § 1382c(a)(3)(B).

[24]20 C.F.R. §§ 404.1520 and 416.920.

[25]*Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).

substantial gainful activity.[26]  If so, the claimant will be found not disabled regardless of his

medical condition or his age, education, or work experience.[27]  The second step involves

determining whether the claimant's impairment is severe.[28]  If it is not severe, the claimant is

deemed not disabled.[29]  In the third step, the Commissioner compares the severe impairment with

those on a list of specific impairments.[30]  If it meets or equals a listed impairment, the claimant is

deemed disabled without considering his age, education, or work experience.[31]  If the impairment

is not on the list, the Commissioner, in the fourth step, reviews the claimant's residual functional

capacity (RFC) and the demands of his past work.[32]  If the claimant is still able to do his past

work, the claimant is not disabled.[33]  If the claimant cannot perform his past work, the

Commissioner moves to the fifth and final step of evaluating the claimant's ability, given his

residual capacities, age, education, and work experience, to do other work.[34]  If the claimant

cannot do other work, he will be found disabled.  The claimant bears the burden of proof at the

---

[26]20 C.F.R. §§ 404.1520 and 416.920.

[27]*Id.*

[28]*Id.*

[29]*Id.*

[30]*Id.*

[31]*Id.*

[32]*Id.*

[33]*Id.*

[34]*Id.*

first four steps of the sequential analysis.[35]  Once the claimant has shown that he is unable to perform his previous work, the burden shifts to the Commissioner to show that there is other substantial gainful employment available that the claimant is not only physically able to perform, but also, taking into account his exertional and nonexertional limitations, able to maintain for a significant period of time.[36]  If the Commissioner adequately points to potential alternative employment, the burden shifts back to the claimant to prove that he is unable to perform the alternative work.[37]

**B.  Findings and Conclusions of the ALJ**

In the instant case, the ALJ reached his decision at step four of the evaluation process. The ALJ first determined that Ramirez had not engaged in substantial gainful activity since his alleged onset date of June 14, 2000[38]—the day Ramirez maintains that he injured his left shoulder.[39]  In step two, the ALJ determined that Ramirez has the following medically-determinable severe impairments: left shoulder impingement syndrome status post open partial acromionectomy, bilateral hip osteoarthritis status post right hip surgery, and mild obesity.[40]  In step three, the ALJ determined that these impairments are not severe enough to meet or medically equal one of the impairments listed in 20 C.F.R., Part 404, Subpart P, Appendix 1 (Appendix

---

[35]*Leggett*, 67 F.3d at 564.

[36]*Watson  v. Barnhart*, 288 F.3d 212, 217 (5th Cir. 2002).

[37]*Anderson v. Sullivan*, 887 F.2d 630, 632-33 (5th Cir. 1989).

[38]SSA record, p. 13.

[39]*Id*.

[40]*Id*. at p. 16.

1).[41]  In step four, the ALJ determined that Ramirez could not perform even sedentary work on a regular and continuous basis during time period from March 1, 2001 through December 10, 2002.  The ALJ determined that as of December 2002, Ramirez experienced medical improvement related to his ability to perform work and regained the RFC for sedentary work and the ability to perform his past relevant work as an assembler.[42]  The ALJ determined that since December 10, 2002, Ramirez has the following RFC: Ramirez can lift and carry only 10 pounds with the left upper extremity.  Ramirez's ability to lift and carry with his right upper extremity is normal.  Ramirez can stand or walk for two hours of an 8-hour day.  He is limited to only occasional climbing of ramps and stairs and balancing.  Ramirez cannot perform overhead work with the left upper extremity.[43]  The ALJ concluded that Ramirez was under a disability as defined by the Act from March 1, 2001 through December 10, 2002, but not before March 1, 2001 or after December 10, 2002.

## C.  Ramirez's Allegations of Error

Ramirez does not appear to challenge the ALJ's determinations about his ability to work prior to March 1, 2001, nor is there any basis for doing so.  The record reflects that Ramirez injured his shoulder on June 14, 2000, but he did not seek medical treatment until July 7, 2000.[44]

---

[41]*Id*. at p. 17 & 20.

[42]*Id*.

[43]*Id*. at pp. 18 & 20-1.

[44]*Id*. at p. 96.

On his first doctor's office visit, the treating physician diagnosed Ramirez as having tendinitis[45] and bursitis[46] in his left shoulder and released Ramirez to work with no left-hand work.[47] Ramirez returned to the same medical treatment facility three times during the same month. Each time, the treating physician released Ramirez to work with no left-hand work.[48]  Ramirez did not return to work, but continued to complain about shoulder pain.  On November 16, 2000, the treating physician noted that Ramirez's range of motion in his left shoulder was normal[49] and diagnosed the left shoulder as having impingement with subacromial bursitis.[50]  Impingement occurs when the soft tissues of a joint are between the bony joint components.  Subacromial bursitis is the "[i]nflammation of the bursa situated between the acromion of the scapula and the capsule of the shoulder joint, usually caused by irritation from excessive use of the arm, chronic or acute trauma, and possibly impairment of the blood supply.  It is marked by pain . . .

---

[45]Tendinitis is the "[i]nflammation of a tendon or tendons."  J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. T-TG-956 (Matthew Bender 2005).

[46]Bursitis is the [i]nflammation of a bursa."  J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. B-5121  (Matthew Bender 2005).  A bursa is a "small, flattened sac filled with a thick oil-like fluid which acts as a protective pad by being interposed between the adjacent surfaces of moving tissues, thereby preventing the surfaces from rubbing against each other. . . .  Where a muscle or tendon has to move over the hard surface of a bone, a bursa is usually found between the moving surfaces, so that the moving part rolls over rather than rubs against the bone."  *Id.* at p. B-5054. "[A]n inflamed bursa is very painful when tissues around it are in motion.  A common site for an inflamed bursa is the top of the shoulder. . . ."  *Id.* at p. B-5121.

[47]SSA record, p. 96.

[48]*Id.* at pp. 92-4.

[49]*Id.* at p. 103.

[50]*Id.*

aggravated by movement of the arm."[51]  The same doctor checked Ramirez's shoulder the following month and opined that Ramirez had low probability of improving without surgery.[52] Ramirez underwent surgery on his left shoulder on March 5, 2001.[53]  Because all of the evidence prior to that time indicates that Ramirez could have worked, substantial evidence supports the ALJ's determination that Ramirez was not disabled prior to the surgery.

Rather than challenging the time period between Ramirez's alleged onset date and his shoulder surgery, Ramirez's arguments focus on the ALJ's determination that Ramirez later experienced medical improvement and regained the ability to perform sedentary work.  He contends the ALJ erred in the following ways:

a.  The ALJ erred in finding that Ramirez's impairments do not equal a listed impairment.

b.  The ALJ failed to establish medical improvement in Ramirez's condition that warranted the cessation of disability benefits.

c.  The ALJ erred by not obtaining a psychiatric assessment.

d.  The ALJ's determination about Ramirez's RFC is incorrect because he failed to properly evaluate the medical opinions.

e.  The ALJ failed to make a proper credibility assessment.

f.  The ALJ erred in finding that Ramirez can perform his past relevant work.

g.  The ALJ erred by determining that Ramirez was not disabled under Medical Vocational Guideline 201.17.

---

[51]J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. S-7156 (Matthew Bender 2005).

[52]SSA record, pp. 101 & 103.

[53]Id.  The surgeon performed a left shoulder arthroscopy with labral debridement, and arthroscopic subacromial decompression and bursectomy.

Despite these complaints, the ALJ made no error of law and substantial evidence supports the ALJ's decision.

    <u>Whether Ramirez has an impairment that equals a listed impairment</u>.  Ramirez argues that his impairment meets all of the criteria for listing 1.02A of Appendix 1 and that he may meet the criteria 12.05C.  If a claimant's impairment meets or equals a listed impairment, the claimant is deemed disabled without considering his age, education, or work experience.[54]  Listing 1.02A applies to major dysfunction of a joint(s).  To equal this listing, a dysfunction of a joint must be "[c]haracterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s)."  In addition, such an impairment must involve "one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in *inability to ambulate effectively*, as defined in 1.00B2b [of the listing]. . . ."[55]  "Inability to ambulate effectively means an extreme limitation of the ability to walk; *i.e.*, an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities."[56]

    The evidence in this case shows that Ramirez is limited in his ability to ambulate, but it does not show that Ramirez has an extreme limitation in his ability to walk.  No evidence indicates that Ramirez's hip problem interferes very seriously with his ability to independently

---

[54]20 C.F.R. §§ 404.1520 and 416.920.

[55]20 C.F.R., pt. 404, subpt. P, appx. 1, § 1.02A (emphasis added).

[56]*Id*. at § 1.00B.1.b(1)

initiate, sustain, or complete activities.  Ramirez first sought treatment for right hip pain on

December 10, 2001, after hurting his hip while playing with his son.[57]  At that time, Dr. Michael

Diment observed that X-rays of Ramirez's right hip and femur showed no specific abnormality.

The following week, Dr. Diment observed that Ramirez was quite limited in the rotation of his

hips and that Ramirez experienced pain with weight bearing.  Dr. Diment opined that Ramirez

was at high risk for a pathological fracture and recommended a prophylactic pinning.[58]  Dr.

Diment performed a right hip pinning on December 28, 2001.  X-rays taken after the surgery

showed no fracture, dislocation or other abnormality.[59]  Dr. Diment continued to treat Ramirez

for the next few months, observing on January 28, 2002 that Ramirez had made significant

progress.[60]  At that time, Dr. Diment observed that Ramirez could almost walk without a limp

and that Ramirez had reasonable hip motion.[61]  Despite this progress, Ramirez continued to

complain about pain,[62] so Dr. Diment ordered a bone scan.  The bone scan showed some diffuse

degenerative change, but identified no abnormality in the thigh area.[63]  At a two-month follow-up

for Ramirez's hip pinning, Dr. Diment observed that Ramirez was progressing nicely and that

---

[57]SSA record, pp. 105-7 & 137.

[58]*Id*. at p. 136.

[59]*Id*. at p. 190.

[60]*Id*. at p. 134.

[61]*Id*. at p. 134.

[62]*Id*. at p. 133.

[63]*Id*. at p. 180.

Ramirez was taking very little pain medication.[64]

Ramirez was evaluated for the purpose of disability benefits on September 17, 2002 by Dr. R. Scott Lazzara.  Dr. Lazzara observed that Ramirez experienced pain at the anterior aspect of both hip joints and that Ramirez had difficulty getting on and off the examination table, had severe difficulty with heel-to-toe walking, severe difficulty squatting, and was unable to hop.[65] The results of range-of-motion tests for the hips placed Ramirez within normal limits.[66]  Dr. Lazzara wrote that Ramirez walked with a moderate right-sided limp without the use of an assistive device.[67]  Dr. Lazzara concluded that Ramirez had degenerative arthropathy—arthritis —in the bilateral hips, with the right hip being worse than the left hip.[68]  He also opined that Ramirez had patellar arthritis in his knees and continued pain in the acromioclavicular joint[69] with diminished range of motion.[70]  Results of the most recent X-rays[71] of Ramirez's hips—taken on December 23, 2004—showed mild chronic clavicular joint space narrowing bilaterally and

---

[64]*Id*. at p. 132.

[65]*Id*. at p. 114.

[66]*Id*. at p. 115.

[67]*Id*.

[68]*Id*. at p. 116.

[69]An acromioclavicular joint is a "freely-movable type of joint connecting the outer end of the clavicle (collarbone) with the acromion process of the scapula or shoulder blade.  The acromion process is a crooked bony extension of the shoulder blade, at the angle of the shoulder.  The chief movements of the joint are gliding and rotation."  J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. A-1841 (Matthew Bender 2005).

[70]SSA record, p. 116.

[71]*Id*. at p. 218.

severe avascular necrosis of the bilateral femoral heads.[72]  A doctor's note dated January 12,

2005 indicates that Ramirez has been prescribed a shoe lift to equalize leg length[73] and has been

instructed to engage in physical therapy at home.[74]

This evidence shows that Ramirez has problems with his hip joints—more so with the

right hip—that affects his ability to ambulate, but it does not show that he has an extreme

limitation in his ability to walk.  As examples of ineffective ambulation, the SSA regulations list

"the inability to walk without the use of a walker, two crutches or two canes, the inability to walk

a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public

transportation, the inability to carry out routine ambulatory activities, such as shopping and

banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand

rail."[75]  Although this list is not exhaustive, there is nothing in the record that compares with

these examples.  The ALJ did not err in finding that Ramirez's impairments do not equal listing

1.02A.

Ramirez also maintains that he meets listing 12.05C.  Listing 12.05 applies to mental

retardation.  "Mental retardation refers to significantly subaverage general intellectual

functioning with deficits in adaptive functioning initially manifested during the developmental

---

[72]Avascular necrosis of head of femur means the "[d]eath of bone tissue in the head (upper end) of the femur (bone of thigh), due to an insufficient blood supply to the bone.  Small fractures occur as the necrosis progresses, with eventual collapse of the bone, joint stiffness, and loss of range of motion." J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. A- 12866 (Matthew Bender 2005).

[73]SSA record, at p. 217.

[74]Id. at p. 216.

[75]20 C.F.R., pt. 404, subpt. P, appx. 1, § 1.00B.1.b(2).

period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22."[76]  To

meet subsection C of the listing, a claimant must have "[a] valid verbal, performance, or full

scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and

significant work-related limitation of function."  Ramirez maintains that if the ALJ had granted

his request for a psychiatric examination, the examination would shown that he has a verbal,

performance, or full scale IQ of 60 through 70.  The *Diagnostic and Statistical Manual of Mental*

*Disorders* (DSM-IV-TR)[77]  places an individual with an IQ score of 50–55 to 70 in the range of

mild retardation.[78]  Ramirez contends the ALJ failed to perform his duty to develop the record by

denying his request for an evaluation.

> The ALJ owes a duty to a claimant to develop the record fully and fairly to ensure
> that his decision is an informed decision based on sufficient facts. . . . An ALJ
> must order a consultative evaluation when such an evaluation is necessary to
> enable the ALJ to make the disability determination.  A consultative evaluation
> becomes "necessary" only when the claimant presents evidence sufficient to raise
> a suspicion concerning a non-exertional impairment.  [I]solated comments by a
> claimant are insufficient, without further support, to raise a suspicion of
> non-exertional impairment.[79]

The record in this case does not include even an isolated comment to support a suspicion

that Ramirez is mentally retarded.  Ramirez relies, in part, on a comment by a SSA interviewer to

support his request for an evaluation.  The interviewer wrote on that it was "hard to get a straight

answer from [Ramirez.]  Either he had trouble understanding what I was asking or he just didn't

---

[76]20 C.F.R., pt. 404, subpt. P, appx. 1, § 12.05A.

[77]Am. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 27
(4th ed., text revision, 2000) (hereinafter DSM-IV-TR).

[78]*Id*. at p. 42.

[79]*Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996).

know how to answer me."[80]  In addition to this comment, Ramirez relies on what appears to be a question regarding his educational level.  Ramirez indicated on his application that he completed the 11th grade,[81] but he testified during his hearing that he completed the seventh or eighth grade.[82]  When the ALJ questioned Ramirez about why he had indicated that he had completed the 11th grade, Ramirez explained that he was trying get a good job.[83]  This response undoubtedly struck the ALJ as incredible as Ramirez was not seeking a job, but was instead seeking disability benefits.  By reviewing school records that are not part of the record, the ALJ was able to confirm that Ramirez completed at least the seventh or eighth grade.[84]  When asked if he attended special education classes, Ramirez answered that he attended regular classes.[85]

This evidence is insufficient to raise a suspicion of mental retardation.  Ramirez never mentioned a mental impairment in his original request for benefits; he never sought medical treatment for a mental impairment; and he did not mention this purported impairment until a month prior to his hearing.[86]  Moreover, nothing in the record suggests that significantly subaverage general intellectual functioning with deficits in adaptive functionally manifested before age 22; Ramirez was 46 at the time of his hearing.  Because Ramirez failed to present

---

[80]SSA record, p. 55.

[81]*See id.* at 29 & 64.

[82]*Id*. at p. 230.

[83]*Id*.

[84]*Id*. at p. 231.

[85]*Id*.

[86]*Id*. at p. 50.

evidence sufficient to raise a suspicion concerning a mental impairment, the ALJ did not err by denying Ramirez's request for a psychiatric evaluation.  There is no evidence indicating that Ramirez's intellectual functioning equals listing 12.05C.

Whether substantial evidence supports the ALJ's step four assessment of Ramirez's RFC. Ramirez's challenge to the ALJ's assessment of his RFC focuses on the ALJ's determination that Ramirez experienced medical improvement that enabled him to do sedentary work.  Ramirez argues that a determination about RFC does not equate to medical improvement and that no evidence indicates that Ramirez improved as of December 10, 2002.

Once the Commissioner concludes that a claimant is disabled, the claimant will receive benefits unless the Commissioner proves that substantial evidence demonstrates that "there has been . . . medical improvement in the individual's impairment or combination of impairments (other than medical improvement which is not related to the individual's ability to work), and . . . the individual is now able to engage in substantial gainful activity. . . ."[87]

> Medical improvement is any decrease in the medical severity of [the claimant's] impairment(s) which was present at the time of the most recent favorable medical decision that [the claimant was] disabled or continued to be disabled.  A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with [the claimant's] impairment(s). . . .[88]

In this case, the ALJ determined that Ramirez experienced medical improvement related to the ability to perform work and regained the RFC for a range of sedentary work as of

---

[87] 42 U.S.C.A. § 423(f)(1).  *See Waters v. Barnhart*, 276 F.3d 716, 717 (5th Cir. 2002) (adopting the "medical improvement" standard, which places the initial burden on the government to show that the claimant's disability has ended as of the cessation date, in closed-period cases).

[88] 20 C.F.R. § 404.1594(b)(1).

December 10, 2002.  In making this determination, the ALJ gave substantial weight to testimony by a medical expert.  The medical expert testified that Ramirez did well after the first shoulder surgery and had improvement on May 2001, two months after the surgery.[89]  The medical expert opined that the first shoulder surgery would have impaired Ramirez's ability to work  for several months.[90]  Ramirez's medical records substantiate that progress—two months after the first shoulder surgery, the surgeon wrote that Ramirez had improved significantly,[91] although he expected Ramirez's overall recovery to be slow.  The doctor opined at a two-month followup appointment that Ramirez would probably be unable to return to work as a manual laborer and referred Ramirez for employment rehabilitation.[92]  This evidence constitutes evidence of medical improvement because it shows that Ramirez's left shoulder improved after his first surgery.

The problem with Ramirez's right hip surfaced on December 10, 2001, when Ramirez sought urgent-care treatment for an injury to his right hip.  Dr. Diment who treated the injury recommended a right hip pinning to prevent future fracture.[93]  One week after the right hip pinning, Dr. Diment noted that the hip was doing very well.[94]  One month after the hip pinning, his surgeon opined that Ramirez had made really significant progress and that Ramirez could

---

[89]SSA record, p. 240.

[90]*Id*. at p. 245.

[91]*Id*. at p. 100.

[92]*Id*. at p. 99.

[93]*Id*. at p. 186.

[94]*Id*. at p. 135.

almost walk without a limp.[95]  Two months after the pinning, Dr. Diment wrote that Ramirez

continued to progress nicely, that Ramirez had regained the ability to flex his hip independently

and actively, and that Ramirez was taking very little pain medication.[96]  Two weeks later, Dr.

Lazzara's range-of-motion tests placed Ramirez's hips within normal limits and observed that

Ramirez walked with a moderate right-sided limp.[97]  This evidence reflects medical improvement

because it shows that Ramirez's right hip improved after his surgery and Ramirez regained the

ability to flex his hip independently and actively.

 During the course of his recovery from the hip pinning, Ramirez began to complain about

pain in his left shoulder,[98] so Dr. Diment sought and received approval for a second shoulder

surgery.[99]  Dr. Diment performed a second surgery—a partial acromionectomy[100]—on July 5,

2002[101] and diagnosed Ramirez as having left shoulder impingement.[102]  At a six-weeks post-

surgery followup exam, Dr. Diment observed that the shoulder had a good range of motion.[103]  At

---

[95]*Id*. at p. 134.

[96]*Id*. at p. 132.

[97]*Id*. at p. 115.

[98]*Id*. at p. 132.

[99]*Id*. at p. 131.

 [100]An acromionectomy is the "surgical excision (cutting out) of the acromion process of the
scapula (shoulder blade). The acromion process is the expanded end of the spine of the scapula."
J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. A- 1852 (Matthew Bender 2005).

[101]SSA record, p. 191.

[102]*Id*. at p. 111.

[103]*Id*. at p. 191.

a two-month post-surgery followup, Dr. Diment stated that Ramirez was improving, but only

very slowly.[104]  Two weeks later, Dr. Lazzara's evaluation assessed Ramirez left shoulder with

normal ranges of motion.[105]  On October 30, 2002—three months after the second shoulder

surgery—Dr. Diment observed that Ramirez still complained about problems with his left

shoulder and decided to evaluate Ramirez in six weeks.[106]  At that time, Dr. Diment stated that he

was releasing Ramirez to return to work on December 31, 2002.[107]  He opined that it did not

appear that Ramirez would ever be released to work without restrictions and that Ramirez may

not be able to return to work at all.[108]  He explained that Ramirez appeared to be reaching a

plateau in the recovery of the left shoulder and that he expected Ramirez's shoulder to have

reached the maximal medical improvement[109] by December 31, 2002.[110]  Six weeks later on

December 10, 2002, Dr. Diment saw Ramirez for the last time.[111]  Dr. Diment reported that

Ramirez had reached the limit of improvement with his left shoulder and stated that Ramirez was

---

[104]*Id*. at p. 191.

[105]*Id*. at p. 115.

[106]*Id*. at p. 129.

[107]*Id*. at p. 123.

[108]*Id*.

[109]The term "maximum medical improvement" is used by workers compensation statutes "to describe the dividing point between temporary and permanent disability. . . . . Generally, the date of maximum medical improvement is the date after which further recovery from, or lasting improvement to, an injury or disease can no longer be anticipated, based upon reasonable medical probability."  Lee R. Russ, *Couch on Insurance* § 173:70 (3d ed.).

[110]SSA record, p. 123.

[111]*Id*. at p. 127.

able to return to work with restrictions.[112]  Dr. Diment stated that he would limit Ramirez's

lifting, reaching, pushing, and pulling with left upper extremity to 10 pounds below shoulder

level and 5 pounds above shoulder level.[113]  Dr. Diment also stated that he would limit highly

repetitive use of left upper extremity, but opined that Ramirez could tolerate moderate repetitive

work.[114]  This evidence constitutes evidence of medical improvement because it shows that

Ramirez's left shoulder and right hip had improved enough to be released to work—albeit at a

capacity level less than before he injured his shoulder.

The medical expert opined that the three back-to-back surgeries were spaced out enough

to have permitted Ramirez to do some type of sedentary work in between March 2001—the time

of Ramirez's first shoulder injury—and December 2002—when Dr. Diment released Ramirez to

return to work with restrictions.[115]  But the ALJ was more generous than the medical expert,

determining instead that Ramirez was unable to do even sedentary work during that entire time

period.  Although Ramirez characterizes Dr. Diment's last reports as indications that he can do

no work, the record demonstrates that Dr. Diment focused on Ramirez's workers compensation

case—the shoulder injury—and measured Ramirez's improvement according to his capacity

prior to the injury.  While it is true that Dr. Diment indicated that Ramirez was unable to return

to work in his former capacity, he also indicated that Ramirez could work with restrictions.

---

[112]*Id*.

[113]*Id*.

[114]*Id*.

[115]*Id*. at p. 246.  *See id*. at p. 249 (medical expert corrects himself to December 2002 in lieu of January 2003).

Substantial evidence supports the ALJ's determination that Ramirez experienced medical improvement in his impairments related to his ability to work.

Whether the ALJ's determination about RFC is incorrect. Ramirez also complains that the ALJ erred in determining his RFC. He maintains the ALJ did not properly evaluate the medical opinions in the record. Ramirez argues that the ALJ's evaluation of medical opinions is inconsistent and incomplete. Ramirez suggests that the ALJ gave the medical expert's testimony more weight than he gave to the opinions of Ramirez's treating physicians.

The SSA regulations direct the ALJ to give more weight to opinions from a claimant's treating sources than non-treating sources because treating sources are likely to be the doctors most able to provide a detailed, longitudinal picture of a claimant's medical impairment(s).[116] The regulations require controlling weight if a treating doctor's opinion on the nature and severity of a claimant's impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with the other substantial evidence in the claimant's record.[117] If the ALJ doesn't give a treating doctor's opinion controlling weight, the ALJ must consider the following factors in determining how to weigh the opinion: (1) length of the treatment relationship and the frequency of examination, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) any other factor brought to the SSA's attention, or of which the SSA is aware, which tends to support or contradict the opinion.[118]

---

[116]*See* 20 C.F.R. § 404.1527(d).

[117]*See* 20 C.F.R. § 404.1527(d).

[118]*See* 20 C.F.R. § 404.1527(d).

Although Ramirez maintains that the ALJ gave the greatest weight to the testimony of a non-treating source—the testifying medical expert—the ALJ's opinion reflects that the ALJ gave the greatest weight to the opinions of Ramirez's treating physicians and relied on the medical expert to ascertain the as-of date of Ramirez's medical improvement and Ramirez's RFC.  Two physicians treated Ramirez for his shoulder injury and his hip problem—Dr. Salpietro for the first shoulder surgery and Dr. Diment for the hip pinning and second shoulder surgery.  The ALJ's opinion reflects careful consideration of the opinions of those treating physicians.  The ALJ discussed the physicians' treatment records of Ramirez's medical conditions[119] and referred to those opinions when discussing the opinions of non-treating physicians.[120]  The ALJ's consideration of those opinions reflects that ALJ gave controlling weight to those opinions, although the ALJ did not expressly state that he gave the opinions controlling weight.  Because the ALJ gave the opinions controlling weight, the SSA regulations did not require the ALJ to consider the factors listed above.

There was one opinion by a treating physician to which the ALJ did not give controlling weight.  That opinion was expressed by Dr. Tri Dang.  Dr. Dang was treating Ramirez at the time of his hearing.  On a form required by the Department of Human Services for receipt of food stamps, Dr. Dang opined that Ramirez was disabled by severe arthritis.  Dr. Dang, however, indicated that the disability was not permanent and that the disability was expected to last more

---

[119]SSA record, pp. 14-5.

[120]*See id.* at p. 18 (repeatedly referring to the claimant's treatment history and opinions of his treating physicians); *id.* at p. 19 (two more references to the opinion of treating physicians).

than six months.[121]  To constitute a disability for the purposes of the Act, an impairment must be disabling for twelve continuous months.[122]  The ALJ explained that Dr. Dang's opinion on the food-stamps form was inconsistent with Dr. Dang's clinical findings, as well as the clinical findings of Ramirez's previous treating physicians, the medical expert, and the state agency medical consultants.[123]  In doing so, the ALJ complied with the SSA regulations by considering the listed factors and explaining why he did not give a treating source's opinion controlling weight.

Ramirez also criticizes the ALJ because his RFC finding does not place a limitation on Ramirez's ability to perform repetitive tasks and fails to acknowledge that Ramirez requires the use of a crutch with his right hand during two hours per day.  I found nothing in the record indicating that Ramirez must use a crutch two hours a day.  Evidence of Ramirez's ability to ambulate during the closed period indicates that he walked without an assistive device.  The complaint about repetitive tasks is based on a treatment note that Dr. Diment wrote on Ramirez's last visit.  Dr. Diment wrote that he would "limit highly repetitive use of [Ramirez's] left extremity, but moderate repetitive use would be tolerable for Ramirez."[124]  Notably, Dr. Diment did restrict Ramirez from all repetitive motion, but instead restricted Ramirez from highly repetitive use of Ramirez's left extremity.  Dr. Diment explicitly stated that Ramirez could tolerate moderate repetitive use of his left arm.  Because no evidence indicates that Ramirez can

---

[121]*Id*. at p. 154.

[122]*See* 20 C.F.R. §§ 404.1505 & 404.1509.

[123]SSA record, pp. 18-9.

[124]*Id*. at p. 127.

24

tolerate no repetitive use of his left arm, the ALJ did not err by not including "no repetitive use of the left arm" as part of Ramirez's RFC.

After reviewing the record, I conclude that substantial evidence supports the ALJ's determination about Ramirez's RFC.  The ALJ's determination that Ramirez can lift and carry only 10 pounds with the left upper extremity is supported by Dr. Diment's opinion[125] and Dr. S.S.Purewal's evaluation.[126]  The ALJ's determination that Ramirez's ability to lift and carry with his right upper extremity is normal is supported by Dr. Purewal's evaluation[127] and Dr. Lazzara's range-of-motion study.[128]  The ALJ's determination that Ramirez can stand or walk for two hours of an 8-hour day is supported by a RFC assessment by Dr. Lazzara[129] and the medical expert's testimony.[130]  The ALJ's determination that Ramirez is limited to only occasional climbing of ramps and stairs and balancing is supported by Dr. Lazzara's RFC assessment.[131]  The ALJ's determination that Ramirez cannot perform overhead work with the left upper

---

[125]*See id*. at p. 127 (opining that Ramirez's ability to work is limited to lifting, reaching, pushing, and pulling with left upper extremity to 10 pounds below shoulder level and 5 pounds above shoulder level).

[126]*See id.* at p. 141 (reporting that Ramirez can return to work with restrictions and specifying that Ramirez can lift or maneuver up to 10 pounds with his left arm as long as the lifting is not above his waist level).

[127]*See id.* at p. 141 (stating that Ramirez has no restrictions regarding use of right arm and shoulder).

[128]*See id.* at p. 115 (reflecting normal range of motion of right shoulder).

[129]*See id.* at p. 120.

[130]*See id.* at 255 (stating, after discussing Ramirez's hip problems, that Ramirez can stand and walk six hours per day).

[131]*See id.* at p. 121.

extremity is supported by Dr. Diment's clinical notes,[132] Dr. Purewal's assessment,[133] and Dr. Lazzara's RFC assessment.[134]

After determining Ramirez's RFC, the ALJ consulted a vocational expert to determine whether Ramirez could perform his past relevant work.  The ALJ determined that Ramirez can perform his past work as an assembler.  Ramirez contends that the ALJ did not perform a meaningful review of the demands of his past work in making this determination.

"[W]hen making a finding that an applicant can return to his prior work, the ALJ must directly compare the applicant's remaining functional capacities with the physical and mental demands of his previous work."[135]  "The mere inability of a claimant to perform certain 'requirements of his past job does not mean that he is unable to perform 'past relevant work' as that phrase is used in the regulations'; rather, the Commissioner may also consider the description of the claimant's past work as such work is generally performed in the national economy."[136]  Thus, even though Ramirez may be unable to do certain tasks required of some assembler jobs, he is not disabled if he can perform his past work as such work is generally performed in the national economy.

In this case, the ALJ questioned Ramirez about his past work, including his job on an

---

[132]*See id.* at p. 127.

[133]*See id.*  at p. 141 (recommending work restrictions, including no reaching or lifting above the shoulder while using left arm).

[134]*See id.* at p. 122 (opining that Ramirez can do occasional overhead reaching).

[135]*Latham v. Shalala*, 36 F.3d 482, 484 (5th Cir. 1994).

[136]*Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (internal citation omitted).

assembly line.  When questioned about his job as an assembler, Ramirez testified that his job involved placing a little screw in the motors of refrigerators.[137]  He stated that the job required him to sit more than stand and that his job did not require lifting or carrying.[138]  After listening to Ramirez's testimony and to the medical expert's testimony, a vocational expert testified that a hypothetical person with Ramirez's RFC could perform the assembler job.[139]  The vocational expert was familiar with how Ramirez had performed his past job as well how the job of assembler is performed generally in the economy.  Even if the ALJ did not question Ramirez about whether his past job required frequent reaching and handling as he complains, Ramirez had the burden at this step of the process.  No evidence indicates that Ramirez cannot handle items as an assembler.  And even if Ramirez's former job required reaching, Ramirez can reach with his right arm.[140]  Although Ramirez complains that the Dictionary of Occupational Titles classifies his past job as light work, the ALJ "may rely upon the vocational expert's testimony provided that the record reflects an adequate basis for doing so."[141]  Here, the record does not indicate that Ramirez cannot return to placing screws in the motors of refrigerators, despite his impairments.

---

[137]*See* SSA record, pp. 234-5.  The ALJ referred to the job as a job assembling plumbing parts, but the transcript of the hearing does not reflect that Ramirez assembled plumbing parts.  The transcribed portion of the hearing reflects that Ramirez put little screws in refrigerator motors.  Some parts of the recording were inaudible so the ALJ may have referred to the job in terms of plumbing parts based on his recollection of the hearing.

[138]*See id.*

[139]*See id.* at p. 265.

[140]In his brief, Ramirez states that he is left-handed and that he is significantly limited by his left shoulder impairment.  Ramirez's medical records do not support this position.  Ramirez's medical records make it clear that he is right-handed.

[141]*Carey v. Apfel*, 230 F.3d 131, 146 (5th Cir. 2000).

The ALJ's determination is supported by substantial evidence and the ALJ did not make an error of law.

    <u>Whether the ALJ made a proper credibility assessment</u>.  During the hearing, the ALJ questioned Ramirez about why he is unable to work in a sedentary position like his former job as an assembler.  Ramirez answered that he could not sit for too long because his back and hips ache.[142]  The ALJ referred to Ramirez's testimony that he cannot sit for more than 15 to 20 minutes in his opinion[143] and then stated that Ramirez's "subjective allegations are credible only to the extent they are consistent with the findings and rationale herein."[144]  Ramirez contends that the medical opinions that the ALJ relied on in making his credibility assessment do not support the assessment.  Ramirez suggests that the ALJ picked-and-chose portions of medical opinions to support his credibility assessment.

    In determining whether a claimant is disabled, the SSA considers all of the claimant's symptoms and the extent to which those symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.[145]  Other evidence includes the claimant's own statements, statements from the claimant's treating or non-treating physician, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how the claimant's impairments and any related

---

[142]SSA record, p. 237-8.

[143]*Id*. at p. 17.

[144]*Id*. at p. 18.

[145]20 C.F.R. § 404.1529.

symptoms affect his ability to work.[146]  In evaluating the intensity and persistence of the

claimant's symptoms and determining the extent to which the claimant's symptoms limit his

capacity to work, the SSA considers the following factors:

> (i) the claimant's daily activities;
> (ii) the location, duration, frequency, and intensity of the claimant's pain or other
> symptoms;
> (iii) precipitating and aggravating factors;
> (iv) the type, dosage, effectiveness, and side effects of any medication the
> claimant takes or has taken to alleviate pain or other symptoms;
> (v) treatment, other than medication, the claimant receives or has received for
> relief of pain or other symptoms;
> (vi) any measures the claimant uses or has used to relieve pain; and
> (vii) other factors concerning the claimant's functional limitations and restrictions
> due to pain or other symptoms.[147]

Because a credibility determination is an issue of fact before the ALJ,[148] the district court must

determine whether substantial evidence supports the ALJ's finding.  The ALJ's credibility

finding is entitled to considerable deference.[149]  Although the ALJ did not specifically address

each of the above-listed factors in his opinion, specific consideration supports the ALJ's

credibility finding.

Ramirez's daily activities:  The record contains very little information about Ramirez's

daily activities.  When Ramirez applied for disability benefits, he indicated that he shopped for

---

[146]*See id.*

[147]*See id.*

[148]*See Scharlow v. Schweiker*, 655 F.2d 645, 648 (5th Cir. 1981) ("How much pain is disabling is a question for the ALJ since the ALJ has primary responsibility for resolving conflicts in the evidence."); Social Security Reg. 96-7p ("In basic terms, the credibility of an individual's statements about pain or other symptoms and their functional effects is the degree to which the statements can be believed and accepted as true."), *available at* www.ssa.gov.

[149]*See Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994).

groceries and clothing, he did laundry every two weeks, he cooked twice a week, and washed dishes once a week.[150]  He also reported that he visited his family and relaxed at home during the day.[151]  He reported pain in his hips when he sits.[152]  Ramirez also reported to Dr. Lazzara that he did laundry, shopped, cooked and washed dishes.[153]  He reported that can sit for 15 minutes.  Dr. Lazzara, however, opined that Ramirez can sit for 6 hours in a work day.[154]

The location, duration, frequency, and intensity of Ramirez's pain or other symptoms: When Ramirez applied for disability benefits, he indicated that he felt pain in his left shoulder, right hip, and in his legs and knees due to arthritis.[155]  He described his pain as aching and throbbing.[156]  Ramirez has complained about pain fairly consistently since July 2000.

Precipitating and aggravating factors:  Ramirez reported that moving causes him pain and that not moving too much makes his pain better.[157]

Type, dosage, effectiveness, and side effects of any medication to alleviate pain or other symptoms:  When Ramirez applied for disability benefits, he reported taking an over-the-counter

---

[150]SSA record, p. 84.

[151]*Id*. at p. 85.

[152]*Id*. at pp. 83 & 86.

[153]*Id*. at p. 124.

[154]*Id*. at p. 120.

[155]*See id.* at p. 81.

[156]*See id.*

[157]*Id*.

pain medication—Aleve—for pain.[158]  He reported no side effects.[159]  Beginning in November

2003, Ramirez was prescribed Vicodin for pain.[160]

Treatment, other than medication, Ramirez receives or has received for relief of pain or

other symptoms:  Dr. Dang referred Ramirez to a dietician for weight loss[161] and physical therapy

for improvement in range of motion in his hips[162] as part of his treatment of Ramirez's arthritis.

Measures the claimant uses or has used to relieve pain:  None reported.

Other factors concerning Ramirez's functional limitations and restrictions due to pain or

other symptoms:  Although Ramirez has consistently complained about pain in his hips since he

injured his right hip, no doctor has imposed work restrictions on sitting.  His doctors have

observed difficulty in Ramirez getting on-and-off of an examination table but have never

recorded that he has difficulty sitting.  In addition, Ramirez's report that "not moving too much"

makes his pain better[163] suggests that Ramirez experiences less pain when sitting.  Evidence

exists that Ramirez experiences pain in his hips due to arthritis, but no evidence indicates that his

pain is so disabling that he cannot perform any type of work.  Considering the deference given to

the ALJ's credibility determinations,[164] substantial evidence supports the ALJ's credibility

---

[158]*Id*. at p. 82.

[159]*Id*.

[160]*Id*. at p. 181.

[161]*Id*. at p. 213.

[162]*Id*. at p. 216.

[163]*Id*. at p. 81.

[164]*See Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994).

assessment.

Whether the ALJ erred by determining that Ramirez was not disabled under Medical Vocational Guideline 201.17. Ramirez argues that because he cannot perform his past work as a assembler, the ALJ was required to proceed to step five of the disability-determination process to determine whether he retains the ability to perform work that exits in significant numbers in the economy. Once a claimant has shown that he is unable to perform his previous work, the burden shifts to the Commissioner to show that there is other substantial gainful employment available that the claimant is not only physically able to perform.[165] Ramirez did not show that he is unable to perform his previous work as an assembler. Thus, the ALJ was not required to proceed to step five.

## VI. Recommendation

Substantial evidence supports the ALJ's decision that Ramirez is not disabled and the ALJ did not make an error of law. I recommend that Ramirez's request for relief (docket entry # 3) be DENIED and that the Commissioner's decision denying Ramirez benefits be AFFIRMED.

## VII. Instructions for Service and Notice of Right to Object/Appeal

The United States District Clerk shall serve a copy of this memorandum and recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "Filing User" with the Clerk of Court, or (2) by mailing a copy to those not registered by certified mail, return receipt requested. Written objections to this memorandum and recommendation must be filed within 10 days after being served with a copy of same, unless

---

[165] *Watson v. Barnhart*, 288 F.3d 212, 217 (5th Cir. 2002).

this time period is modified by the district court.[166]  **Such party shall file the objections with the Clerk of the Court, and serve the objections on all other parties and the magistrate judge.**  A party filing objections must specifically identify those findings, conclusions or recommendations to which objections are being made and the basis for such objections; the district court need not consider frivolous, conclusive or general objections.  A party's failure to file written objections to the proposed findings, conclusions and recommendations contained in this report shall bar the party from a *de novo* determination by the district court.[167]  Additionally, failure to file timely written objections to the proposed findings, conclusions and recommendations contained in this memorandum and recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.[168]

      **SIGNED** on January 21, 2008.

NANCY STEIN NOWAK
UNITED STATES MAGISTRATE JUDGE

---

[166]28 U.S.C. §636(b)(1); FED. R. CIV. P. 72(b).

[167]*Thomas v. Arn*, 474 U.S. 140, 149-152 (1985); *Acuña v. Brown & Root, Inc.*, 200 F.3d 335, 340 (5th Cir. 2000).

[168]*Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).